**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| EXPLORER INSURANCE COMPANY,<br>*Plaintiff/Counter-Defendant*,<br>v.<br>NAGEL FARM SERVICE, INC.,<br>*Defendant/Counter-Plaintiff,*<br>*Third-Party Plaintiff*<br>v.<br>PENN MILLERS INSURANCE COMPANY<br>*Third-Party Defendant* | No. 24-cv-1346-ABA |

**MEMORANDUM OPINION**

This is an insurance coverage dispute among Nagel Farm Service, Inc. ("Nagel"), Explorer Insurance Co. ("Explorer"), and Penn Millers Insurance Co. ("Penn Millers"). Nagel operates a commercial grain and farm supply business in Maryland. One of its employees, Bryan Dukes, died by electrocution while making a delivery of lime at a farm owned by Edward Steen, Susan Steen, Jesse Steen, and Steen Farms, LLC (the "Steens"). That tragedy led to litigation including between Dukes's estate and the Steens; between the Steens and Nagel; and in this Court among Nagel and its insurers. Nagel, Explorer, and Penn Millers have all filed motions for summary judgment.

The bulk of the parties' dispute focused on whether either insurer owed Nagel a duty to *indemnify* in the event a judgment were entered against Nagel. That dispute is moot; the underlying claim against Nagel was dismissed, the dismissal was not appealed, and those parties settled under terms that establish that Nagel faces no further liability exposure. What remains principally is a question of whether Explorer and/or Penn Millers owed Nagel a duty to defend, *i.e.*, a duty to cover the fees and costs

incurred in defending against the Steens' claim. For the reasons explained herein, they did. This opinion also addresses whether Explorer owes Penn Millers reimbursement for some or all of the fees Penn Millers has incurred defending Nagel or in litigating this case, and whether Nagel may recover from Explorer or Penn Millers the fees Nagel incurred in this case.

**Table of Contents**


I. Background ........ 3
  A. Factual and procedural background ........ 3
  B. The challenged coverage denials ........ 6
    i. Explorer ........ 7
    ii. Penn Millers ........ 8
  C. Procedural background after this case was filed ........ 13
  D. Summary judgment motions ........ 14
II. Discussion ........ 16
  A. Standard of review ........ 16
  B. The parties' disputes related to any duties to indemnify are moot. ........ 18
  C. The duty to defend under Maryland law ........ 18
  D. Explorer owed Nagel a duty to defend ........ 20
    i. The "necessary or incidental" requirement ........ 20
    ii. Explorer's choice-of-law argument ........ 23
    iii. Employee classifications ........ 24
    iv. Liability assumed under a contract ........ 25
  E. Penn Millers also owed Nagel a duty to defend under the Commercial Liability Umbrella coverage ........ 27
  F. Penn Millers's right to contribution from Explorer for Nagel's fees in the underlying litigation ........ 28
  G. Penn Millers's counterclaim against Nagel ........ 31
  H. Fee shifting ........ 32
    i. Nagel's fee-shifting claim against Explorer ........ 32
    ii. Nagel's fee-shifting claim against Penn Millers ........ 33
    iii. Penn Millers's fee-shifting claim against Explorer ........ 34
III. Conclusion ........ 36

# I. BACKGROUND[1]

## A. Factual and procedural background

"At all times material to this lawsuit, Nagel Farm Service, Inc. operated a hardware store and a commercial grain and farm supply business from five physical workplaces, all located on the Eastern Shore of Maryland." ECF No. 51-8 (Declaration of Chad Nagel) ¶ 4. Nagel "had no workplace or office in any jurisdiction other than Maryland." *Id.* Its business involves deliveries in a multistate area. ECF No. 61-2 (Deposition of Chad Nagel) ("Chad Nagel Dep.") at 2 (38:8–16) (estimating that Nagel Farm Service's deliveries are approximately 50 percent in Delaware, 20 percent in Pennsylvania, 25 percent in Maryland, and 5 percent in Virginia).

After Nagel's delivery trucks drop off a delivery, they're generally empty. To generate additional revenue from those round trips and avoid "dead miles," *id.* at 9 (49:15), Nagel contracts with other companies to transport materials headed back in the direction that Nagel's trucks would otherwise be driving: a win-win for Nagel and for the company that has material headed in that direction. That business is called "back haul," *i.e.*, hauling material "back" in the direction the truck would be heading anyway.

Nagel's business is commercial grain and farm supply as noted above; it does not itself identify businesses with hauling needs. Instead, it obtains back haul jobs through Warwick Enterprises, Inc., a Maryland "freight broker." *Id.* at 3 (40:17). As Chad Nagel,

[1] At the summary judgment stage, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (quoting *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018)).

Nagel's corporate designee, explained, "when Nagel Farm Service had trucks looking for product to haul, Warwick was oftentimes in a position to offer us loads that we could haul with our truck and trailer." *Id.* (40:14–21). "If our truck was in a position such that they were too far from our facilities in Maryland to justify coming home empty without a payload, we would prefer to have some product to haul that would earn revenue for the truck and the driver." *Id.* at 8 (48:12–16); *see also id.* at 4 (41:6–18) ("When Warwick has customers that need to move product and they need available trucks to do so, they would reach out to us[] to move that product," including grain as well as "other agricultural commodities such as lime. . . . [S]imilarly, if we needed a back haul for our trucks, we would oftentimes reach out to Warwick to see if they had loads available to be hauled in close proximity to where we were and where we were trying to go."). Under Nagel's arrangement with Warwick, Nagels trucks would provide deliveries under contract with Warwick in Maryland, Delaware, Pennsylvania, and Virginia. *Id.* at 7 (46:8–12). Nagel's deliveries of "grain" and "other agricultural commodities" as part of its arrangement with Warwick occurred "[o]ften . . . daily, usually weekly, and almost always at least monthly." *Id.* at 4 (41:9–11) & 7 (46:18–21). Nagel's revenue from back haul operations for Warwick entailed less than five percent of Nagel's overall revenue. *Id.* at 13 (55:4–8).

The electrocution at Steens Farm occurred during one such back haul delivery on November 22, 2019. Earlier that day, Dukes had conducted a delivery to a Nagel customer. The location is not in the summary judgment record, but what is in the record is that that delivery made it advantageous to Nagel for Dukes (and another Nagel employee, James Dorman) to handle a back haul job that was available through Warwick while they were heading back to Maryland. That job was to pick up a large load

of lime from a limestone quarry in Gap, Pennsylvania and deliver it to Steens Farm, in Laurel, Delaware. ECF No. 75-10 at 2–6.

Nagel did not have a contractual relationship with the Steens; the Steens had contracted with Warwick for the delivery, and Warwick in turn had contracted with Nagel to transport the lime to the Steens. *Id.*; *see also* ECF No. 75-7 at 3–5 (deposition of Edward Steen, 19:5–18, 28:15–16); ECF No. 75-5 at 6 (Chad Nagel Dep.) (47:8–12) (explaining that for backhaul deliveries, "Warwick would pay Nagel directly a predefined rate, based on the origin and the destination"); ECF No. 61-2 at 15 (74:17–19) (Chad Nagel Dep.) ("It just so happened that Steens was the delivery spot. But we were performing a service for Warwick, not for the Steens.").

The vehicle Dukes was driving that day was a truck pulling a large "dump trailer": a trailer that carried cargo and could raise like the back of a dump truck. ECF No. 1-3 at 5–6; ECF No. 75-9 at 13–21 (photos). Dukes was fatally electrocuted when, while he was unloading the lime at Steens Farm, the dump trailer came into contact with overhead electrical lines. *See Coulter v. Steen*, No. N20C-12-207 SPL, 2025 WL 2505753, at *1 (Del. Super. Ct. Aug. 29, 2025).

Following Dukes's death, Nagel paid workers compensation benefits as awarded by the Workers' Compensation Commission of Maryland. ECF No. 75-12; *Coulter*, 2025 WL 2505753, at *7 ("Nagel Farm . . . compensated Dukes' Estate through Maryland Workers' Compensation."). His estate then sued the Steens in the Superior Court of Delaware. ECF No. 1-2.[2] The estate did not sue Nagel, but after Dukes's estate sued the

[2] The estate also sued the electric company responsible for installing and maintaining overhead electric lines servicing the Steens' farm; that claim is not relevant to the present case. *See Coulter*, 2025 WL 2505753, at *1, *5–7.

Steens, the Steens filed a third-party claim against Nagel. ECF No. 1-3 (third-party complaint). The Steens' claim was for breach of an implied duty of indemnification. "Delaware law recognizes that an implied contractual obligation to indemnify a third party may operate as an exception to Delaware's workers' compensation exclusivity scheme." *Coulter*, 2025 WL 2505753, at *7 (quoting *Hindinger v. J & M Temp, LLC*, 2023 WL 2292489, at *6 (Del. Super. Ct. Feb. 28, 2023)). As the Superior Court of Delaware later described the claim, the Steens asserted "that, through an implied covenant, Nagel Farm owed them a duty to perform 'work in a workman like and safe manner' and that Dukes' death was the result of a breach of that duty." *Id.*; *see also* ECF No. 1-3 (Steens' complaint against Nagel) ¶¶ 12–14.

### B. The challenged coverage denials

When Nagel found itself facing a claim by the Steens arising from Dukes's death, it turned to its insurance carriers: Explorer (on September 1, 2022) and Penn Millers (on August 26, 2022). ECF No. 14 at 9 ¶ 13; ECF No. 33 ¶ 48. Nagel, through counsel, laid out its arguments for why Penn Millers and Explorer owed Nagel a duty to defend and a duty to indemnify through letters on February 5 and March 28, 2024, respectively.[3] Nagel asserted that one or both owe Nagel duties to indemnify and/or defend Nagel in connection with the Steens' claim. The two insurers took different approaches to Nagel's request for coverage.

---

[3] The February 5 and March 28 letters are not in the record, but are referred to in the insurers' response letters of May 8 and 14, 2026. ECF No. 51-7 at 1; ECF No. 51-6 at 1.

### i. Explorer

On May 8, 2024, Explorer (through counsel) denied Nagel's request for coverage, concluding that Explorer did not owe Nagel a duty to defend or indemnify. ECF No. 51-6 (May 8, 2024 letter from Explorer to Nagel). The policy under which Nagel sought coverage from Explorer (defense costs and indemnification) based on the Steens' claim was a Workers Compensation and Employers' Liability Insurance Policy for the period May 1, 2019 to May 1, 2020 (Policy No. WPH 5041038 01). ECF No. 1-1. Nagel contended that the Employers' Liability Insurance portion of that policy (Part Two of the policy) applied to the Steens' claim. Explorer articulated two bases for denying coverage (including defense costs). The first was the following:

> [T]he Employer's Liability Coverage, which may apply to a third party claim, is only applicable to work in Maryland. While the accident happened while Mr. Dukes was making a delivery in Delaware, his principal place of employment was Maryland and he was a Maryland employee for the purposes of determining where his work was located.

ECF No. 51-6 at 3. The premise for that basis for denial was the "Information Page" for the policy, which states that Employers' Liability coverage "applies to work in . . . MD [Maryland]." ECF No. 1-1 at 3. The policy went on to define "work in . . . [Maryland]" for purposes of the Employers' Liability coverage in Part Two as "any injuries or death "aris[ing] out of and in the course of the injured employee's employment by [the insured company, here Nagel]," so long as the injured employee's "employment" by Nagel was "necessary or incidental to your work in [Maryland]." *Id.* at 9 (Part 2.A).[4]

---

[4] The Explorer policy also included what was called "Other States Insurance"—for 46 other states (including Delaware, where Dukes was killed during the delivery at Steens Farm). ECF No. 1-1 at 3. The "Other States Insurance" coverage applied if Nagel "beg[a]n work in any one of those states after the effective date of this policy and are not

Explorer's other reason for denial was based on the following exclusion in the Explorer policy: "This insurance does not cover . . . [l]iability assumed under a contract. This exclusion does not apply to a warranty that your work will be done in a workmanlike manner[.]" *Id.* at 10. Based on that exclusion, Explorer stated:

> [T]he insurance covers third party indemnification damages only where recovery for such damages is permitted by law. Maryland law does not permit a third party indemnification claim against an employer, absent a statute or express written contract granting a right of indemnification. The Third Party Complaint does not allege either a statutory right or a written contractual agreement between the Steens and Nagel Farm allowing for indemnification.

ECF No. 51-6 at 3.

**ii. Penn Millers**

Penn Millers took a different approach in its coverage letter (dated on May 14, 2024, *see* ECF No. 51-7). Although Nagel had a single policy with Penn Millers, the policy was comprised of five types of coverage: Agribusiness Property, Commercial General Liability (CGL), Inland Marine, Business Auto, and Commercial Liability Umbrella. ECF No. 16-1.[5] Nagel sought coverage under three of those coverages, the terms of which are in the record as follows:

---

insured or are not self-insured for such work." *Id.* at 11. Although Nagel contended in its counterclaim against Explorer that "Other States" coverage applied, ECF No. 35 ¶ 43, it did not rely on that coverage in its motions for summary judgment or in opposing the insurers' motions. In any event, because the Court concludes that Explorer and Penn Millers owed Nagel a duty to defend based on the potential that Dukes's delivery at Steens Farm was "necessary or incidental" to his work in Maryland, the Court need not decide whether the insurers owed Nagel a duty to defend based on the "Other States" part of the Explorer policy.

[5] In its letter in response to Nagel's request for coverage, Penn Millers described the policy as "Agribusiness Property, General Liability, Inland Marine, Business Auto, or

| Coverage | Declarations | Policy |
|---|---|---|
| Commercial General Liability (CGL) | ECF No. 16-1 at 14–16 | ECF No. 16-4 |
| Business Auto | ECF No. 16-1 at 18–29 | ECF No. 16-2 |
| Commercial Liability Umbrella | ECF No. 16-1 at 30–31 | ECF No. 16-3 |

The first two are standalone coverages. The Umbrella coverage (as pertinent here) provided excess coverage over the Employers' Liability policy that Nagel held with Explorer. *See* ECF No. 16-1 at 30 (identifying the Employers' Liability as one of Nagel's "underlying coverages" covered by the Umbrella policy). Explorer was Nagel's primary Employer' Liability insurer, and Penn Millers was only obligated to indemnify Nagel for judgments exceeding the limits of liability under the Explorer policy ($1 million per "accident"). *See* ECF No. 1-1 at 3; ECF No. 16-1 at 30 (excess coverage above $1 million, up to $5 million per occurrence).

Penn Millers first explained that there was no potential for coverage under the Commercial General Liability (CGL) or Business Auto coverages based on those coverages' Contractual Liability Exclusion: an express exclusion of coverage for "'[b]odily injury' or 'property damages' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." ECF No. 51-7 at 5; *see also* ECF No. 16-4 at 2 (§ 2.b). Penn Millers contended that the Steens' claim for breach of an implied duty of indemnification fell within that exclusion because the Steens' claim was that Nagel was "obligated to pay damages" to the Steens because Nagel had impliedly agreed to assume a duty to indemnify the Steens. And although the

---

Employee Benefit Liability coverage parts of the Penn Millers's Agribusiness Policy issued to Named Insureds Nagel Farm Service Inc., Nagel Farm Service II LLC, and Wye Mills Grain Co. ATIMA for the policy period May 1, 2019, to May 1, 2020, with policy number PAC 2606323 02." ECF No. 51-7 at 1.

Contractual Liability Exclusion contains an exception (*i.e.* the exclusion does not apply) for claims based on a breach of "an 'insured contract', provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement," *id.* (§ 2.b.2), Penn Millers's position was there was no "execution" of any "contract or agreement" between Nagel and the Steens, let alone one *prior* to Dukes's death; "[r]ather, the Steens' allegation is that the indemnification obligation, if it exists, is imposed by law not by a voluntary assumption by Nagel." ECF No. 51-7 at 15; *see also id.* at 15–17 (citing cases).

Penn Millers also pointed to an additional reason there was no potential for coverage under the CGL coverage: it excludes coverage for injuries arising out of the "ownership, maintenance, use or entrustment to others of any . . . 'auto.'" ECF No. 16-4 at 4 (§ 2.g). And "auto" includes "a land motor vehicle, trailer or semitrailer." *Id.* at 13 (§ V.2.a); *see also* ECF No. 51-7 at 13–15 (citing cases).

For those reasons, Penn Millers concluded there was no potential that either the CGL or Business Auto policies provided coverage to Nagel of the Steens' claim—meaning it owed neither a duty to defend nor a duty to indemnify under those policies.

But Penn Millers reached a different conclusion with respect to the excess/umbrella coverage over Explorers' Employers' Liability coverage. Penn Millers's substantive coverage obligation in that policy was coextensive with and excess of Explorer's, *i.e.*, if there was coverage for a given claim under Explorer policy and the potential liability exposure exceeded $1 million, Explorer and Penn Millers both owed Nagel a duty to defend, and Explorer would pay the first $1 million of a judgment and Penn Millers would be liable for the rest (up to $5 million). *See* ECF No. 16-3 at 1 ("We will pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit'

because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking damages for such 'bodily injury' or 'property damage' when the 'underlying insurance' does not provide coverage or the limits of 'underlying insurance' have been exhausted."); ECF No. 16-1 at 30 (declarations page).

As noted above, by the time Penn Millers issued its letter on May 14, 2024, Explorer had already staked out a coverage position: no duty to indemnify, no duty to defend. ECF No. 51-6. Penn Millers was not so sure, particularly against the backdrop of Maryland law, under which "the duty to defend is broader than the duty to indemnify," and "[d]oubts as to potential liability are resolved against the insurer." *Perdue Farms, Inc. v. Travelers Cas. and Surety Co. of America*, 448 F.3d 252, 257 (4th Cir. 2006).

Penn Millers's position was that Explorer and Penn Millers both owed Nagel a duty to defend (albeit under a reservation of rights)—Explorer under its Employers' Liability policy, and Penn Millers under its Umbrella coverage. Why, one might wonder at this point, would Penn Millers acknowledge a duty to defend under the Umbrella coverage where that coverage also contained a contractual liability exclusion—and where Penn Millers had rejected a duty to defend under its CGL and Business Auto coverage based on the contractual liability exclusion in those policies? The reason is a subtle but important distinction between the "insured contract" *exceptions* to the insurers' respective contractual liability exclusions. Whereas the exception in the Penn Millers policy applies only where the pertinent injury (here, the Steens' claim against Nagel) "occurs subsequent to the execution of the contract or agreement," ECF No. 16-4 at 2 (§ 2.b.2), the exception in the Explorer policy applies to a "warranty that your work will be done in a workmanlike manner," ECF No. 1-1 at 10 (Part 2.C.1).

Given that distinction, Penn Millers concluded that there *was* a potential that both Explorer and Penn Millers could be found to owe coverage to Nagel because the Steens' claim against Nagel "specifically alleges that Nagel breached its implied promise to perform its work on the subject site in a workman like manner." ECF No. 51-7 at 17. Thus Penn Millers agreed to fund Nagel's defense costs:

> Penn Millers takes no position on whether Explorer's position is correct or not, but has determined that there is a potential for coverage under the Employer Liability coverage part of the Explorer Policy. Until such time that there is a determination of coverage under the Employer Liability coverage part of the Explorer Policy, Penn Millers will provide a defense to Nagel under the Umbrella coverage as excess to the Employer Liability coverage subject to a full and complete reservation of all rights.

*Id.*

But Penn Millers also made clear that it considered Explorer to at least potentially be in breach of a duty to Nagel—and thus Penn Millers staked out a potential claim against Explorer for contribution (which it later asserted as a cross-claim):

> Penn Millers only has a "right and duty to defend the insured" against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. Although Explorer has reiterated its denial of coverage, it appears to Penn Millers that the claims in the [Steens' complaint] potentially may be covered under the Employers Liability policy. . . .

*Id.* at 18. Penn Millers also expressly "reserve[d] the right to seek reimbursement from Explorer for all costs and expenses in providing the defense to Nagel if it is determined that there is coverage under the Explorer Policy." *Id.*

### C. Procedural background after this case was filed

Explorer filed this case in May 2024 against Nagel. ECF No. 1. Nagel answered that complaint and asserted a third-party claim against Penn Millers. *See* ECF No. 14 (amended answer); ECF No. 16 (third party complaint). Explorer answered the counterclaim. ECF No. 19. Penn Millers answered Nagel's claims against it, and further asserted a cross-claim against Explorer. ECF Nos. 28 & 43. Nagel amended its claims against Penn Millers and Explorer. ECF Nos. 33 & 35. Penn Millers and Explorer answered those amended complaints, ECF Nos. 38 & 43, and Penn Millers asserted a counterclaim against Nagel. ECF No. 43 at 33–36. Nagel dropped the bad faith claims it had asserted. *See* ECF Nos. 39–42.

Meanwhile, Nagel had filed a motion to dismiss a counterclaim that Penn Millers had asserted against it, in which Penn Millers sought reimbursement from Nagel of the defense costs that it had advanced to Nagel under a reservation of rights. ECF No. 43 at 33–36. Nagel moved to dismiss that counterclaim, contending that Penn Millers did owe Nagel a duty to defend and that, regardless, Maryland law forecloses such a claim. ECF No. 45-1 at 4–13. This Court dismissed Penn Millers's counterclaim against Nagel. *Explorer Ins. Co. v. Nagel Farm Serv., Inc.*, Case No. 24-cv-1346-ABA, 2025 WL 1798132 (D. Md. June 30, 2025). It explained that under Maryland law, which applies here, "the duty to defend is broader than the duty to indemnify," and "[d]oubts as to potential liability are resolved against the insurer." *Perdue Farms*, 448 F.3d at 257. The Court held that, for purposes of Penn Millers's duty to defend—as opposed to its duty to indemnify—(1) the delivery by Dukes at Steens Farm in Delaware was at least potentially "necessary or incidental" to Dukes's work for Nagel in Maryland, and (2) the fact that the cause of action that the Steens asserted against Nagel is not recognized under

Maryland law does not defeat the insurers' duty to defend because "Nagel has shown that there is at least a potentiality that Delaware law applies to the Steens' implied contract of indemnity claim and that such a claim is at least arguably permitted by Delaware law, and thus that there is a duty to defend with respect to the implied contract of indemnity claim." *Explorer*, 2025 WL 1798132 at *5–6; *see also* ECF No. 14 at 15–16 ¶ 45 (Nagel's counterclaim, quoting Explorer's denial basis, upon which Penn Millers relied in its counterclaim); *see also, e.g.*, ECF No. 28 at 19 (Penn Millers's answer, invoking this point) & 33–38 (Penn Millers's counterclaim against Nagel and its cross-claim against Explorer).

Two months after this Court dismissed Penn Millers's counterclaim, the Delaware Superior Court held that there is *not* a basis under Delaware law for the Steens to recover from Nagel. *Coulter*, 2025 WL 2505753, at *7–8. But that is a separate question from whether, prior to that ruling, there was at least a "potential" that the Delaware court could have ruled the other way.

Since then, the underlying litigation in Delaware brought by Dukes's estate against the Steens had settled. ECF No. 84 ¶ 2; ECF No. 85 ¶¶ 2–3. The parties also have reported that "Nagel Farm did not contribute to that settlement and there will be no indemnity obligation from any insurer to Nagel Farm." ECF No. 85 ¶ 3.

### D. Summary judgment motions

As noted above and as explained below, although for a period of time Nagel faced the risk that the Steens would obtain a *judgment* against Nagel, no judgment was ever obtained and Nagel no longer faces any risk of exposure to such a judgment. The dispute at this point is limited principally to whether the Steens' claim gave rise to a duty by

Explorer and/or Penn Millers to cover Nagel's defense costs. The parties have filed the following additional four sets of motions[6]:

First, Nagel has filed motions for summary judgment against Explorer and Penn Millers, arguing that both insurers owe Nagel duties to defend and indemnify (ECF Nos. 51 & 53). In addition to addressing the insurers' non-coverage arguments, ECF No. 51-1 at 8–33; ECF No. 53-1 at 10–13 & 23–47, Nagel argues that by denying coverage (and, when it comes to Explorer, refusing to cover defense costs) the insurers breached their contractual obligations to Nagel and thus Nagel is entitled to fees and costs not only in defending against the Steens' claims but also in this coverage action. ECF No. 51-1 at 33–38; ECF No. 53-1 at 48–49.

Second, Explorer has filed a cross-motion for summary judgment (and response to Nagel's motion), arguing that it has no duty to defend or indemnify Nagel or to reimburse Penn Millers for defense costs it has advanced to Nagel. ECF No. 61. Explorer argues principally that (1) the aspect of Nagel's business that Dukes was performing, back haul operations, was outside the scope of the Explorer policy; (2) even if "back haul" operations were covered if performed in Maryland, the fact that the accident occurred in Delaware precludes coverage because the Delaware delivery was not "necessary or incidental" to Dukes' work in Maryland; and (3) the policy's exclusion for "liability assumed under a contract" (other than warranty claims) precludes coverage of the Steens' claims. *Id.* at 4–20. Nagel filed a brief in opposition to Explorer's motion and Explorer filed a reply. ECF Nos. 70 & 73.

---

[6] All of those motions, and all of the related briefs other than the latest response briefs (ECF Nos. 76–78), were filed before the Delaware Superior Court's ruling in *Coulter v. Steen* and before the settlement of the underlying case.

Third, Penn Millers has filed a cross-motion for summary judgment (and response to Nagel's motion), arguing that it has no duty to defend or indemnify Nagel. ECF No. 75. Penn Millers argues that there is no coverage, either to defend or indemnify, because (1) the claim arises out of the use of an "auto"; (2) the contractual liability exclusion precludes coverage; and (3) if there is no duty to indemnify under the Explorer employer liability policy, there is no duty to indemnify under the Penn Millers commercial liability umbrella policy. ECF No. 75-1 at 12–34. Penn Millers also argues that Explorer—not Penn Millers—is Nagel's "primary insurer under its Employer's Liability coverage" and thus must "reimburse Penn Millers for the defense costs it has paid on behalf of Nagel for the Underlying Action" as well as for the costs Penn Millers has incurred in this coverage action. *Id.* at 34–40. Penn Millers also argues that this Court should not adjudicate the insurers' duty to indemnify (as opposed to their duties to defend and the claims related to defense costs and coverage-litigation costs) given that Nagel has defeated the Steens' claims in the Delaware Superior Court. *Id.* at 40–41. Regarding Penn Millers's motion for summary judgment, the parties have filed responses and reply briefs. ECF Nos. 76 & 77.

Fourth, Nagel has filed a motion to dismiss the counterclaim that Penn Millers has reasserted against it, incorporating the same arguments it raised in moving to dismiss Penn Millers's original counterclaim. ECF No. 72. Penn Millers filed a brief in opposition. ECF No. 74.

## II. DISCUSSION

### A. Standard of review

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment on a "claim or defense—or the part of [any] claim or defense"—by showing

that "there is no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if proof of its existence "might affect the outcome of the suit," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[C]ourts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Sedar*, 988 F.3d at 761 (quoting *Variety Stores,* 888 F.3d at 659). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a moving party carries this burden, then the Court will award summary judgment unless the non-moving party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). The "mere existence of a scintilla of evidence in support of the [opposing party's] position," however, is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

Because the parties filed cross-motions for summary judgment, the Court will consider each motion separately and will consider the relevant facts in the light most favorable to each non-moving party. *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985) ("When presented with cross-motions for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard.'") (quoting Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2720).

### B. The parties' disputes related to any duties to indemnify are moot.

As noted above, this insurance coverage case, when filed, presented questions related to the insurers' duties to defend and to indemnify. Since then, the underlying litigation in Delaware brought by Dukes's estate against the Steens settled. ECF No. 84 ¶ 2; ECF No. 85 ¶¶ 2–3. The parties also have reported that "Nagel Farm did not contribute to that settlement and there will be no indemnity obligation from any insurer to Nagel Farm." ECF No. 85 ¶ 3. That development significantly narrows the scope of the coverage disputes in this case. Prior to the settlement of the underlying litigation in Delaware, Explorer and Penn Millers sought judgments that they were not liable for Nagel's defense costs *or* for indemnification. *See, e.g.*, ECF No. 1 ¶ 15 (Explorer); ECF No. 28 at 36 & 38 (Penn Millers). Nagel sought a judgment that both insurers owed it both a duty to defend and a duty to indemnify. ECF No. 33 at 31 (Nagel against Penn Millers); ECF No. 35 at 23 (Nagel against Explorer).

Given the settlement, which did not require Nagel to contribute any funds, and which confirmed that "there will be no indemnity obligation from any insurer to Nagel Farm," ECF No. 85 ¶ 3, Explorer and Penn Millers's request for a declaratory judgment that they do not owe Nagel a duty *to indemnify* is now moot. What remains are questions related to the duty to defend.

### C. The duty to defend under Maryland law

"[A]n insurer's duty to defend is distinct conceptually from its duty to indemnify, *i.e.*, its obligation to pay a judgment." *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 15 (2004). "One major distinction is that the duty to defend depends only upon the facts as alleged, and the duty to indemnify depends upon liability." *Id.* But the distinction more

pertinent to the present dispute—where at this point Nagel faces no liability exposure—is that "the duty to defend is broader than the duty to indemnify" because "[a]n insurance company has a duty to defend its insured for all claims that are *potentially* covered under the policy." *Id.* (emphasis added, citing *Litz v. State Farm*, 346 Md. 217, 225 (1997), and *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 407–08 (1975)).

Determining whether an insurance policy "potentially" covers a given claim under Maryland law requires considering two questions: "(1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? [And] (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage?" *Springer v. Erie Ins. Exch.*, 439 Md. 142, 167 (2014) (quoting *Brohawn*, 276 Md. at 193). "The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit"—questions that "[a]t times . . . involve separate and distinct matters, and at other times . . . are intertwined." *Id.* The inquiry into whether an insurer owes an insured a duty to defend boils down to "whether the allegations in the underlying action potentially could fall within the scope and limitations of coverage." *Walk*, 382 Md. at 13.

The Supreme Court of Maryland instructs that "the duty to defend should be construed liberally in favor of the policyholder." *Springer*, 439 Md. at 167. Put differently, "[e]ven if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy." *Walk*, 382 Md. at 16. And although "potentiality of coverage" is ordinarily determined based on comparing the face of a complaint to the face of a policy (sometimes called the "eight corner rule"), "[a]n insured may rely on extrinsic evidence where the underlying complaint 'neither

conclusively establishes nor negates a potentiality of coverage.'" *Id.* at 12, 16 (quoting *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 108 (1995)). An insured's right to rely on extrinsic evidence to show that an insurer owes a duty to defend does not mean an insurer may rely on extrinsic evidence to defeat a duty to defend; the Maryland courts have "kept in place an asymmetrical prohibition on the use of extrinsic evidence by the insurer." *Cowan Systems, Inc. v. Harleysville Mut. Ins. Co.,* 457 F.3d 368, 372 (4th Cir. 2006).

### D. Explorer owed Nagel a duty to defend

As noted above, Explorer denied coverage under the Employer's Liability policy—not only with respect to indemnification but also any duty to defend—for two reasons: because the accident occurred in Delaware, and because Maryland law does not recognize a cause of action for breach of an implied indemnity. ECF No. 51-6 at 3. It has asserted additional reasons in this litigation. Explorer may have turned out to be correct in its coverage position if the Steens had obtained a judgment against Nagel or if those parties had settled, *i.e.*, on the ultimate question of whether the Steens' claim gave rise to a duty to indemnify. But applying the "potentiality" standard required under Maryland law, the undisputed evidence in the record establishes that Explorer owed Nagel a duty to defend.

#### i. The "necessary or incidental" requirement

The first policy term on which Explorer relies to defend its decision not to defend Nagel is the requirement that for the policy's Employers Liability coverage to apply, the "employment" from which the "bodily injury" arose must have been "necessary or incidental to [Nagel's] work *in [Maryland]*." ECF No. 53-2 at 9 (emphasis added). Specifically, Part 2.A.2 states that to constitute a covered Employers' Liability bodily

injury claim, the injury must have "arise[n] out of and in the course of the injured employee's employment by [Nagel]" and "[t]he employment must be necessary or incidental to your work *in a state or territory listed in Item 3.A.* of the Information Page." ECF No. 53-2 at 9 (emphasis added). The only state listed in Item 3.A is Maryland. ECF No. 1-1 at 3.

Explorer offers two arguments for why, when Dukes was delivering lime to Steens Farm in Delaware, he was not engaged in work that was "necessary or incidental" to his work for Nagel in Maryland. Neither excuses Explorer's failure to defend Nagel.

First, Explorer relies on the fact that Steens Farm was in Delaware, not Maryland. ECF No. 61 at 7 (arguing that "Nagel Farm's Employer's Liability Insurance applies only in Maryland"). This position might have some validity if the policy had been limited to work by Nagel's employees *performed in Maryland*. But that is not what the policy says. It extends to work "necessary or incidental" to Nagel's work in Maryland. Nagel operates a "hardware store and a commercial grain and farm supply business." ECF No. 51-8 ¶ 4. Its physical locations are in Maryland, and it undisputedly supplies commercial agricultural customers in a multistate area: only 25 percent of its deliveries are in Maryland, while 75 percent are in Delaware, Pennsylvania or Virginia. ECF No. 61-2 at 2 (38:8–16). Thus, in duty-to-defend terms, there is at least a potentiality that the Employers' Liability coverage extended to work performed by Nagel employees in states other than Maryland, so long as that work is "necessary or incidental" to those employees' employment for Nagel—which as noted above was necessarily employment for Nagel *in Maryland* given that Nagel's physical locations are exclusively in Maryland.

Second, Explorer focuses on the fact that Dukes was performing a back haul delivery at the time of his death. Explorer does not dispute that Dukes's delivery was

within the scope of his work for Nagel at the time he was electrocuted, and that Nagel is a Maryland corporation with locations exclusively in Maryland. But Explorer argues that his delivery to Steens Farm was not "necessary or incidental" to his work for Nagel because it was a back haul delivery, not a delivery of grain or other supplies that had been transported from Maryland. *See* ECF No. 61 at 9–15.

The fact that Nagel had directed Dukes to perform a back haul delivery on his way back from his primary delivery did not relieve Explorer of a duty to defend Nagel against the Steens' claim. Explorer's argument runs headlong into the plain language of the policy, which extends to injuries to Nagel employees while they were performing work "necessary *or incidental*" to their work for Nagel in Maryland. ECF No. 1-1 at 9 (emphasis added). Those back haul deliveries may not have been strictly *necessary*; Nagel could have directed its drivers to drive back to Nagel's locations in Maryland with empty trucks, paying its drivers and consuming fuel with no corresponding revenue—"dead miles" as Chad Nagel put it. ECF No. 61-2 at 9 (49:15). Or Nagel could have partnered with Warwick or another freight broker to generate some additional revenue while those trucks were on the road back to Maryland anyway. Under the plain meaning of the term "incidental," those back haul deliveries were "incidental" to Nagel's business delivering grain and other agricultural commodities—or at least for duty-to-defend purposes there was at least a potentiality that those back haul deliveries were "incidental" to Nagel's Maryland operations. *See Montgomery Cnty. v. Maloney*, 245 Md. App. 369, 395 (2020) (quoting *Montgomery Cnty. v. Smith*, 144 Md. App. 548, 571 (2002)) ("[A]n activity will generally be considered 'a regular incident and condition of the employment' if it is 'an accepted and normal one.'"). As Nagel puts it, "The delivery of lime to the Steens took place only because Nagel Farm had earlier delivered grain to a

customer in Pennsylvania." ECF No. 70 at 11. Dukes was killed while delivering lime as a Maryland-based Nagel employee, with a Nagel truck, on his way back to Maryland, after having performed a Nagel delivery from Maryland, at Nagel's direction and for Nagel's economic benefit. Explorer cannot avoid its duty to defend based on the fact that the delivery to Steens Farm was a back haul delivery.

**ii. Explorer's choice-of-law argument**

The other basis that Explorer articulated contemporaneously for denying Nagel's request for defense costs was that "the insurance covers third party indemnification damages only where recovery for such damages is permitted by law," but "*Maryland* law does not permit a third party indemnification claim against an employer, absent a statute or express written contract granting a right of indemnification." ECF No. 51-6 at 3 (emphasis added). The textual basis in the policy for that position is the provision limiting coverage to "damages . . . where recovery is permitted by law." ECF No. 1-1 at 9. Explorer argues that "the phrase 'where recovery is permitted by law' must be determined as to permitted recovery under Maryland law, not Delaware law, because Maryland's public policy protecting employers from suits by third parties is very strong." ECF No. 61 at 16–17.

But regardless of whether Maryland law applied to disputes regarding the construction of the policy that Explorer issued to Nagel—a proposition Nagel does not dispute—the choice-of-law analysis required by that policy provision (whether recovery is "permitted by law," ECF No. 1-1 at 9) required determining whether the Steens' claim against Nagel was "permitted" by whatever state's law would apply as a matter of ordinary choice-of-law rules. As this Court explained earlier in dismissing Penn Millers's counterclaim against Nagel, "there is at least a potentiality that Delaware law applies to

the Steens' implied contract of indemnity claim and that such a claim is at least arguably permitted by Delaware law, and thus that there is a duty to defend with respect to the implied contract of indemnity claim." *Explorer*, 2025 WL 1798132 at *6. The Court reached that conclusion before the Delaware court granted Nagel's motion for summary judgment in the underlying case. But if anything, that ruling confirmed the Court's earlier conclusion that Delaware law at least potentially applied to the Steens' claim against Nagel; the Delaware court did apply Delaware law to that claim. *See Coulter*, 2025 WL 2505753, at *7–8.

**iii. Employee classifications**

Explorer next turns to additional reasons it contends it had no duty to defend Nagel. It points out that, in defining the scope of coverage, the Information Page on the policy describes three categories of employee "Classifications" covered: "Store—Hardware," "Grain Elevator Operation & Local Managers, Drivers," and "Clerical Office Employees NOC." ECF No. 1-1 at 6. Explorer argues that even if back haul deliveries were "necessary or incidental" to Nagel's work in Maryland (as explained above), the Employers' Liability policy did not extend to back haul deliveries because those deliveries were not separately listed on the Information Page. ECF No. 61 at 5 ("Nothing in the Policy reflects that Explorer insured Nagel Farm or charged a premium for Nagel Farm to be involved in brokered freight delivery for and through third parties."). In other words, Explorer contends that although the Steens' claim arose from work that Dukes was doing in his capacity as a Nagel employee, at Nagel's direction, the specific job was a back haul delivery, which Explorer contends did not involve work within the category of "Grain Elevator Operation & Local Managers, Drivers" work (and there is no question it did not involve "Store—Hardware" or "Clerical Office Employees" work).

At least for duty-to-defend purposes, this last argument fails for similar reasons to why its other back haul argument fails. Explorer concedes that Nagel "insure[d] itself . . . for its grain operation." *Id.* Explorer further concedes that the coverage for "Grain Elevator Operation" included "'the buying, conditioning as needed, storing, selling, and transporting of grain for profit,'" including specifically "'transport[ing] the grain to the facilities of end users in Maryland, Delaware, Virginia and Pennsylvania.'" *Id.* (quoting Chad Nagel's declaration). When Nagel's drivers used Nagel's trucks to deliver Nagel's grain and other materials to customers, that work fell squarely within the "Grain Elevator Operation & Local Managers, Drivers" coverage. And because back haul deliveries were incidental to that grain transportation business (discussed above), the fact that the Information Page does not separately list "back haul" operations does not render those operations outside the scope of coverage.

**iv. Liability assumed under a contract**

Explorer also points to the following exclusion in the Explorer policy: "This insurance does not cover . . . [l]iability assumed under a contract. This exclusion does not apply to a warranty that your work will be done in a workmanlike manner[.]" ECF No. 1-1 at 10. Explorer argues that the Steens' claim, although based on a theory of *implied* indemnification as opposed to a written contract, in substance alleged that Nagel had "assumed" "liability" under an (implied) "contract"—thereby triggering that exclusion. *See, e.g.*, ECF No. 61 at 20; *see also* ECF No. 59 at 20 ("Because Nagel Farm did not make any warranty that work would be done in a workmanlike manner, to either the Steens or Warwick, the contractual liability exclusion applies to preclude any obligation for Explorer to indemnify Nagel Farm in the event that there is a judgment against it on the Third Party Complaint."). But as Penn Millers articulated as far back as

its May 2024 coverage letter, the Steens' complaint "specifically alleges that Nagel breached its implied promise to perform its work on the subject site in a workman[-]like manner," which meant the Steens' allegations "may potentially come within *the exception* to the Employers Liability policy exclusion for contractual liability." ECF No. 51-7 at 17 (emphasis added).

Explorers argues that Nagel "did not make any warranty that work would be done in a workmanlike manner, to either the Steens or Warwick." ECF No. 61 at 20. But the Steens expressly alleged the opposite. For example, the Steens expressly alleged that Nagel "breached its **implied promise to perform its work on the subject site in a workman like manner** in that":

> (a) Nagel Farm Service, Inc.'s employee, Bryan Dukes, created a dangerous condition on the work site by his operation of the subject dump trailer owned by Nagel Farm Service, Inc.
>
> (b) Nagel Farm Service, Inc. knowingly permitted Bryan Dukes to work under dangerous conditions created by his operation of the truck and dump trailer by not acting in a workman like manner in supervising Plaintiffs Decedent.
>
> (c) Nagel Farm Service, Inc. failed to adequately train its employee, Bryan Dukes, in the safe operation of a truck and dump trailer in the presence of electrical lines.
>
> (d) Nagel Farm Service, Inc. specifically knew of the dangers inherent in the operation of a dump trailer in the presence of electrical lines and failed to train or warn Plaintiff's Decedent, Bryan Dukes, of those dangers.
>
> (e) Through its agents, servants, and employees, including its truck driver on site on the date of incident, knew of the specific dangerous condition which ultimately caused Plaintiff's Decedent's injury and death, but failed to act in a way to avoid or prevent Plaintiff's Decedent's injury.

ECF No. 1-3 ¶ 12(a)–(e) (emphasis added). Explorer correctly predicted that Nagel would prevail in defeating the Steens' claim. But the fact that Nagel had the stronger argument on the merits of the Steens' claim did not eliminate Explorer's duty to defend its insured against that claim. Where a lawsuit against an insured "trigger[s] [an] insurer's duty to defend," the insurer must defend the insured "no matter how attenuated, frivolous, or illogical" the underlying claim "may be." *Selective Way Ins. Co. v. Nationwide Prop. & Cas. Ins. Co.*, 242 Md. App. 688 (2019) (*"Selective Way I"*) (quoting *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 643 (1996)). The Steens' complaint expressly and squarely triggered the exception for claims based on an alleged "warranty that your work will be done in a workmanlike manner," which rendered the exclusion for "[l]iability assumed under a contract" inapplicable.

* * *

For these reasons, Explorer owed Nagel a duty to defend it against the claims asserted by the Steens, a duty that Explorer undisputedly breached.

**E. Penn Millers also owed Nagel a duty to defend under the Commercial Liability Umbrella coverage**

As explained above, with respect to the Commercial Liability Umbrella portion of Penn Millers's policy, the scope of coverage was, for the most part, defined by the terms of the Explorer policy. When Nagel requested that Penn Millers cover Nagel's defense costs, Penn Millers agreed with Nagel (under a reservation of rights) that there was at least a potentiality for coverage under the Explorer policy. ECF No. 51-7 at 17. For the reasons explained above (§ II.D), Penn Millers was correct. Although Penn Millers diplomatically "t[ook] no position" at that time "whether Explorer's position is correct or not," *id.*, on the substance it made the correct call.

Accordingly, Explorer and Penn Millers each owed Nagel a duty to defend—Explorer under its Employers' Liability policy, and Penn Millers under the Umbrella coverage of its policy.[7]

### F. Penn Millers's right to contribution from Explorer for Nagel's fees in the underlying litigation

The next question is whether (and if so to what extent) Penn Millers may recover from Explorer some or all of Nagel's attorneys' fees that Penn Millers paid in the underlying litigation. *See* ECF No. 75-1 at 37–40 & ECF No. 77 at 16–17.

Under Maryland law, "an insured may recover attorneys' fees incurred due to the insurer's wrongful denial of a duty to defend." *Litz*, 346 Md. at 232. "An insurer breaches its duty to defend if it refuses to defend a suit where a claim is potentially covered by the policy." *Selective Way I*, 242 Md. App. at 711. "A cause of action against an insurer for breach of the duty to defend 'sounds in contract' and is 'governed by the principles applicable to breach of contract actions.'" *Id.* (citations omitted). "The 'damages for breach of the contractual duty to defend are . . . the insured's expenses, including attorney fees, in defending the underlying tort action, as well as the insured's expenses and attorney fees in a separate contract or declaratory judgment action . . . to establish that there exists a duty to defend.'" *Id.* (quoting *Mesmer v. Maryland Auto. Ins. Fund*, 353 Md. 241, 264 (1999)). And "[w]hen a liability insurer breaches its duty to defend and another insurer steps in to provide a defense . . . the defending insurer can recover [from the non-defending insurer] reasonable expenses, including costs and

[7] Because Penn Millers owed a duty to defend under the Umbrella coverage, and because Nagel's claims for indemnification are moot, the Court need not decide at this stage whether Penn Millers's denial of coverage under the Business Auto and CGL policies was proper.

attorney's fees incurred in defending the underlying suit." *Selective Way Ins. Co. v. Fireman's Fund Ins. Co.*, 257 Md. App. 1, 51–52 (2023) ("*Selective Way II*") (cleaned up, citations omitted).

Here, as discussed above, the undisputed evidence establishes that Explorer breached its duty to defend Nagel, and Penn Millers "step[ped] in to provide a defense," *see id.* Accordingly, Penn Millers will be entitled to a judgment in its favor on its cross-claim against Explorer for contribution toward Nagel's fees incurred in the underlying litigation. *See also* ECF No. 16-3 at 13 (Nagel agreeing, in its Umbrella policy with Penn Millers, that "[w]hen this insurance is excess, we will have no duty under Coverages **A or B** to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit'. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.").

But several questions remain before the Court will be in a position to enter judgment in Penn Millers's favor on that claim, because the parties' briefs do not squarely address the proportionate allocation of those fees between Explorer and Penn Millers.

One insurer's right to "equitable contribution" from another insurer "is 'entirely different' from a 'purely derivative' right of subrogation, under which a subrogated insurer 'has no greater rights than the insured and is subject to the same defenses assertable against the insured." *Selective Way II*, 257 Md. App. at 44 (quoting *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1292–93 (1998)). "An insurer's 'right of equitable contribution belongs to each insurer individually' and 'exists *independently* of the rights of the insured.'" *Id.* at 43 (quoting *Fireman's Fund*, 65 Cal. App. 4th at 1294). "Equitable contribution is designed to prevent the potential unfair

result that the company that pays first is left to cover the entire loss." *Id.* at 37. Although that principle is articulated most commonly in the context of a duty to indemnify, it also can, in certain circumstances, extend to the duty to defend. *See Selective Way I*, 242 Md. App. at 734 n.12 ("[W]here two liability insurers both provide primary coverage, they jointly share the obligation to pay for the defense of the insured."); *but see Selective Way II*, 257 Md. App. at 38–39 & 39 n.17 (noting that various parties had "overstated the significance" of footnote 12 in *Selective Way I*).

Here, both insurers owed Nagel a duty to defend. And Penn Millers covered all of Nagel's fees, and so Penn Millers at minimum is subrogated to Nagel's claim against Explorer for Explorer's breach of its duty to defend. Penn Millers also has a right of equitable contribution against Explorer. But the parties do not squarely address what the correct or equitable allocation of those fees would be. It may be 50/50 given that both insurers had a duty to defend. But the *Selective Way I* court stated that "[a]n excess insurer's duty to defend does not arise until the policy limits of the primary coverage are exhausted," and "[a]n excess insurer that provides a defense is entitled to recover defense costs from a primary insurer that refuses to defend the insured." *Selective Way I*, 242 Md. App. at 733; *see also id.* at 734 ("Where an excess insurer provides a defense that another insurer was primarily obligated to provide, the primary insurer must reimburse the excess insurer for the costs of defense, as well as the cost of litigation to establish the primary insurer's duty to defend.").

Here, there is no dispute that Explorer was the primary insurer; Penn Millers was an excess insurer under the Employers' Liability provisions of the Umbrella coverage. Accordingly, the rule as articulated in *Selective Way I* may entitle Penn Millers to reimbursement of 100% of Nagel's fees incurred in the underlying litigation. But here,

when the Steens filed their complaint, Nagel faced potential exposure that well exceeded Explorer's policy limits under its Employers' Liability coverage. That exposure is part of what triggered a duty to defend by Penn Millers. Moreover, although no party indicates that Nagel's attorneys' fees exceeded the $1 million policy limits, the amount of those fees is not in the record. Moreover, Penn Millers may be a primary insurer if either or both the Business Auto and CGL policies potentially provided coverage. Accordingly, the parties shall submit supplemental briefing addressing any matters pertinent to the question of *to what extent* Penn Millers may recover from Explorer the attorneys' fees and costs that Penn Millers incurred in the underlying litigation. In so doing, they should address the primary/excess insurer question, the question of whether (and if so how) the principles of equitable subrogation inform the allocation question, and what the proper allocation would be if the Penn Millers Business Auto and CGL policies, in addition to the Umbrella policy, potentially provided coverage. They also should address whether, insofar as a trial is necessary to determine the allocation of fees from the underlying action as between Explorer and Penn Millers, such trial shall be a jury trial or a bench trial. *See* ECF No. 43 at 38 (Penn Millers's jury demand as to "all issues so triable," including with respect to its cross-claim against Explorer); *see also Selective Way I*, 242 Md. App. at 756 (holding that a claim for damages based on a breach of a duty to defend, like ordinary breach-of-contract claims, are not "exempt from the constitutional right to have a jury determine the amount of damages," at least under Maryland law).

### G. Penn Millers's counterclaim against Nagel

Penn Millers has asserted a counterclaim against Nagel for reimbursement of the costs that Penn Millers incurred in defending it in the underlying litigation. The Court

dismissed the earlier version of counterclaim (ECF No. 28 at 33–36) in its earlier opinion. ECF No. 55; *Explorer Ins. Co.*, 2025 WL 1798132 at *5–8. Penn Millers later reasserted that counterclaim, but also asserted a claim for declaratory relief. ECF No. 69 at 35–38. Nagel moved to dismiss that counterclaim for the same reasons in its motion to dismiss its earlier iteration. ECF No. 72. Penn Millers responded, pointing out particularly that Nagel had not responded to the newly asserted request for a declaratory judgment. ECF No. 74 at 3. At this point, however, Penn Millers's counterclaim is moot, because the Court has ruled that Penn Millers owed Nagel a duty to defend, and accordingly the motion to dismiss will be denied as moot.

### H. Fee shifting

That leaves the question of whether any parties are entitled to recover some or all of the fees they incurred in litigating this coverage case. As noted above, one aspect of the damages that an insured may recover based on an insurer's breach of a duty to defend is "the insured's expenses and attorney fees in a separate contract or declaratory judgment action . . . to establish that there exists a duty to defend." *Mesmer*, 353 Md. at 264. The right of an insured who prevails in duty-to-defend litigation to the fees incurred in that litigation "is an exception to the 'American Rule' that a prevailing party cannot recover its own attorneys' fees." *Selective Way II*, 257 Md. App. at 51. Here, Nagel seeks reimbursement from both Explorer and Penn Millers of the fees it has incurred in this coverage case. And Penn Millers seeks reimbursement from Explorer of the costs that Penn Millers has incurred in this coverage litigation.

#### i. Nagel's fee-shifting claim against Explorer

For the reasons explained above, Explorer breached its duty to defend Nagel. Accordingly, the undisputed evidence establishes that Nagel is entitled to recover from

Explorer the attorneys' fees and costs it incurred "to establish" that Explorer owed it a duty to defend. *Mesmer*, 353 Md. at 264; *see also Nolt v. U.S. Fidelity and Guaranty Co.*, 329 Md. 52, 66 (1993) ("The rule in this State is firmly established that when an insured must resort to litigation to enforce its liability insurer's contractual duty to provide coverage for its potential liability to injured third persons, the insured is entitled to a recovery of the attorneys' fees and expenses incurred in that litigation."). The order that accompanies this opinion will require the parties to identify a schedule for supplemental briefing, which shall include Nagel's fee petition on this claim (and if necessary discovery related to that claim, *see* ECF No. 51-1 at 38). The parties' submissions on this claim shall also address whether (and if so how) to account for the fact that this coverage litigation included claims beyond those directly related to Explorer's duty to defend, namely those related to Penn Millers's duty to defend and both insurers' duty to indemnify (the latter of which are moot as discussed above).

**ii. Nagel's fee-shifting claim against Penn Millers**

Nagel also seeks to recover from Penn Millers the fees it has incurred in this coverage litigation. Nagel argues that although Penn Millers satisfied its duty to defend, it should reimburse Nagel for the attorneys' fees Nagel has incurred in this coverage litigation because "Penn Millers has consistently taken the position in its reservation of rights letter and throughout this litigation that it is not required to defend Nagel Farm." ECF No. 76 at 10–11. But Penn Millers did not deny any duty to defend, let alone do so "wrongful[ly]." *See Litz*, 346 Md. at 232 ("an insured may recover attorneys' fees incurred due to the insurer's wrongful *denial* of a duty to defend") (emphasis added). And Nagel has not identified a separate legal basis for its fee-shifting claim against Penn Millers. It cites *Cohen v. American Home Assurance Co.*, 255 Md. 334, 351–63 (1969).

*See* ECF No. 76 at 10. But there the insurer had breached its own duty to defend. *Cohen*, 255 Md. at 363 ("[W]hen an insurer wilfully refuses to perform the obligations required by a liability insurance policy, such as to defend a suit [on] behalf of the insured or to pay a judgment against him, in consequence of which the insured suffers loss, the court can compel the insurer to respond in damages for such loss . . . . American Home produced the current situation when it refused to defend its assured."). Accordingly, Penn Millers is entitled to summary judgment on Nagel's claim against it for fees incurred in this coverage litigation.

**iii. Penn Millers's fee-shifting claim against Explorer**

Finally, Penn Millers seeks reimbursement from Explorer of the fees and costs that Penn Millers has incurred in this coverage litigation.

"When a liability insurer breaches its duty to defend and another insurer steps in to provide a defense," the defending insurer "is subrogated" not only to the insured's right to a defense in the underlying suit, but also to the insured's right to recover its costs "in prosecuting the declaratory judgment action against the breaching insurer." *Selective Way II*, 257 Md. App. at 51–52 (cleaned up, citations omitted). Moreover, "[w]here an excess insurer provides a defense that another insurer was primarily obligated to provide, the primary insurer must reimburse the excess insurer for the costs of defense, *as well as the cost of litigation to establish the primary insurer's duty to defend*." *Selective Way I*, 242 Md. at 734 (emphasis added) (citing *Rentals Unlimited, Inc. v. Aetna Cas. & Sur. Ins. Co.*, 101 Md. App. 652, 662–64 (1994), and *Travelers Indem. Co. v. Insurance Co. of N. Am.*, 69 Md. App. 664, 679–80 (1987)); *see* ECF No. 75-1 at 33–34.

That rule entitles Penn Millers to recovery of at least some of the fees and costs it has incurred in this coverage case. Explorer was Nagel's primary insurer for Employers' Liability coverage; Penn Millers was an excess insurer. And some portion of Penn Millers's work in this case (perhaps the bulk of it) was incurred to "establish" that Explorer had a duty to defend Nagel. *See Selective Way I*, 242 Md. at 734. Moreover, although Penn Millers incurred those fees and costs on its own behalf (as opposed to funding Nagel's counsel)—and thus is not a subrogee of Nagel with respect to those fees—*Selective Way I* and the cases cited therein (*Travelers* and *Rentals Unlimited*) establish that Penn Millers is entitled to recover from Explorer its fees and costs in this case, but only to the extent they were incurred in order "to establish [Explorer's] duty to defend." *See id.*; *see also Rentals Unlimited*, 101 Md. App. at 664 (holding that Rentals Unlimited, which at that time was self-insured, had breached a duty to defend Brown Construction Co., and that Aetna, which had funded Brown's defense, was entitled to recover its "expenses and attorney's fees incurred in defending the underlying claims *and in prosecuting the declaratory judgment motion* due to Rentals's unjustified refusal to defend the underlying claims") (emphasis added); *Travelers*, 69 Md. App. at 667–68 & 679 (holding that Travelers was entitled to recover the costs of obtaining a declaratory judgment that another insurer, INA, owed a duty to defend as primary insurer to Mason-Dixon Recycling Corp.).

In short, insofar as the fees and costs that Penn Millers incurred in this case pertained to "the cost of litigation to establish the primary insurer's duty to defend," *Selective Way I*, 242 Md. at 734, Penn Millers is entitled to recover them. But that does not necessarily entitle Penn Millers to recover *all* of the fees and expenses incurred in this coverage litigation. Nagel's claims against Explorer, and Penn Millers's claims

against Explorer as Nagel's subrogee, were only some of the claims asserted in this case. The briefs filed in this case reflect that Penn Millers also incurred substantial expenses, for example, defending *itself* against Nagel's claim for indemnification from Penn Millers. Like with respect to the question of allocating responsibility for *Nagel's* fees incurred in the underlying litigation, *see* § II.F, *supra*, the Court will order supplemental briefing and evidentiary submissions (and a jury trial if either party shows that it is entitled to one) to determine to what extent Penn Millers is entitled to reimbursement from Explorer of the expenses that it incurred in this coverage litigation.

## III. CONCLUSION

For these reasons, Explorer and Penn Millers owed Nagel a duty to defend, which Penn Millers satisfied but Explorer breached. The previously requested stay will be lifted, and summary judgment will be entered for Nagel on the duty to defend. Nagel's claims for indemnification are moot. As for Nagel's claim for fee shifting from Penn Millers, summary judgment will be entered in favor of Penn Millers and against Nagel. Further litigation will be necessary to adjudicate Penn Millers's request for an order that Explorer reimburse Penn Millers for some or all of Nagel's fees that Penn Miller paid in the underlying litigation and the fees that Penn Millers and Nagel have incurred in this coverage litigation. A separate order follows.

Date: September 22, 2026

*/s/*
Adam B. Abelson
United States District Judge